UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARQUES ISIAHA HEBERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:15-cv-30198-KAR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 13 & 23)
March 17, 2017

ROBERTSON, U.S.M.J.

I.     Introduction

On November 10, 2015, plaintiff Marques Isiaha Hebert ("Plaintiff") filed a complaint

pursuant to 42 U.S.C. § 405(g) against the Acting Commissioner of the Social Security

Administration ("Commissioner"), appealing the denial of his claims for Supplemental Security

Income ("SSI") and Social Security Disability Insurance ("SSDI"). Plaintiff asserts that the

Commissioner's decision denying him such benefits – memorialized in an August 26, 2013

decision by an administrative law judge ("ALJ") – is in error. Specifically, Plaintiff alleges that

the ALJ's conclusion as to Plaintiff's Residual Functional Capacity ("RFC") is not supported by

substantial evidence and that the ALJ erred by not adopting a treating source's opinion when

assessing the Plaintiff's RFC. Plaintiff has moved for judgment on the pleadings requesting that

the Commissioner's decision be reversed, or, in the alternative, remanded for further proceedings

(Dkt. No. 13).  The Commissioner has moved for an order affirming the decision of the Commissioner (Dkt. No. 23).  The parties have consented to this court's jurisdiction (Dkt. No. 16).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court will deny Plaintiff's motion and allow the Commissioner's motion.

II.    <u>Procedural Background</u>

On January 25, 2008, Plaintiff filed applications for SSI and SSDI, alleging an October 1, 2005 onset of disability (Administrative Record ("A.R.") at 7, 533-540).  Plaintiff's applications were denied initially and on reconsideration (*id*. at 61-64).  Plaintiff requested a hearing before an ALJ, and one was held on January 22, 2010 (*id*. at 77-83, 436-72).  Following the hearing, the ALJ issued a decision on May 28, 2010, finding that Plaintiff was not disabled and denying Plaintiff's claims (*id*. at 4-19).  The Decision Review Board selected the decision for review, but did not complete its review within the allotted time, and the ALJ's decision became the final decision of the Commissioner (*id*. at 1-3).  Plaintiff then sought judicial review, and, on June 3, 2011, another session of this court issued an order reversing the ALJ's decision, remanding the case for further administrative proceedings, and entering judgment for Plaintiff (*id*. at 473-477).  Following a new hearing in front of the same ALJ on June 21, 2013, the ALJ issued a new decision on August 26, 2013, again finding that Plaintiff was not disabled and denying Plaintiff's claims (*id*. at 390-408, 409-435).  The Appeals Council denied review on September 10, 2015, and the ALJ's decision became the final decision of the Commissioner (*id*. at 379-383).  This appeal followed.

III.     Legal Standards

A.     Standard for Entitlement to Social Security Disability Insurance

In order to qualify for SSI and SSDI, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.[1]   A claimant is disabled for purposes of SSI and SSDI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); 42 U.S.C. § 423(d)(1)(A).  A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B); 42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under each statute.  *See* 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*.  *See*

---

[1] For SSDI, the claimant also must demonstrate that the disability commenced prior to the expiration of his insured status for disability insurance benefits.  *See* 42 U.S.C. § 423(a)(1).

3

*also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id*.  "RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  The RFC assessment addresses both the remaining exertional and nonexertional capacities of the claimant.  *Id*. at *5.

> Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling.
> ….
> Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength, i.e. all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions.  It assesses an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision).  In addition to these activities, it also considers the ability to tolerate various environmental factors (e.g., tolerance of temperature extremes).

*Id*. at *5-6.

The claimant has the burden of proof through step four of the analysis, *Goodermote*, 690 F.2d at 7, including the burden to demonstrate RFC.  *Flaherty v. Astrue*, 2013 WL 4784419, at *9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform.  *Goodermote,* 690 F.2d at 7.

      B.  <u>Standard of Review</u>

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 1383(c)(3); 42 U.S.C. § 405(g).  Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence.  *Id*. (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999)).  Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'"  *Irlanda Ortiz v. Sec'y of Health & Human Servs*., 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs*., 647 F.2d 218, 222 (1st Cir. 1981)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *Id*.  So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion."  *Id*. at 770.  That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *Nguyen*, 172 F.3d at 35.

IV.    Discussion

A.  The Evidence

1.  Plaintiff's Application

Plaintiff was 20 years old as of his alleged onset date, and he claimed in his applications that he was disabled as a result of having a "[t]racheotomy—airway not big enough to sustain life" (A.R. at 153).  At the two hearings on his application, Plaintiff claimed disability due to his tracheotomy, as well as asthma, learning disabilities, and left eye vision impairment (*id*. at 409-35; 436-72).

2.  Medical Records

Plaintiff has had subglottic stenosis, a narrowing of the lower portion of his larynx, since birth and had a tracheotomy for the first twenty years of his life (*id*. at 203-09).  In August 2005, at age 20 and two months before his alleged onset of disability, Plaintiff underwent laryngeal tracheal reconstruction with decannulation, or removal of the tracheotomy tube, at Boston Children's Hospital ("BCH"), due to improved respiratory status (*id*.).  Plaintiff was seen pre-procedure, on January 3, 2005, at Sumner Pediatrics and was found to have no allergic/immunologic, eye, ear, nose, throat, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, neurologic, hematologic, endocrine, or psychiatric problems (*id*. at 598-600).  Plaintiff presented for his first post-operative visit at BCH's otolaryngology clinic on December 14, 2005, at which time he was "doing well" and reportedly working at a job as a mail handler "with no difficulty" (*id*.).  He was, however, experiencing inspiratory and expiratory stridor, or wheezing (*id*.).  Approximately one week later, on December 20, 2005, Plaintiff presented at the clinic with continued stridor and dyspnea, or shortness of breath, and he was scheduled to undergo a diagnostic laryngoscopy at BCH two days later (*id*.).  During the

procedure, it was determined that Plaintiff had regained scar tissue resulting in re-stenosis of the subglottis, and Plaintiff underwent an emergency tracheotomy (*id*.).  Afterward, Plaintiff was admitted to the intensive care unit (*id*.).  He was discharged on December 27, 2005, in stable and improved condition and able to resume his prior activities (*id*.).

Plaintiff was next seen in the BCH otolaryngology clinic on January 25, 2006.  Plaintiff was "quite unhappy" about the tracheotomy having been reestablished (*id*.).  Plaintiff reported that he was plugging his tracheotomy tube and breathing around it for three hours while at work, but that prolonged plugging left him feeling quite winded and resulted in headaches (*id*.).  The existing tracheotomy tube was replaced with a new one with some difficulty, but no respiratory distress, and it was recommended that Plaintiff take more attentive care of the tube and stoma site and continue to plug the tracheotomy tube for periods of time throughout the day (*id*.).  Plaintiff returned to the BCH otolaryngology clinic on April 12, 2006 (*id*.).  He had a "good voice," was "doing really well," and was able to block the tracheotomy tube and "breathe pretty comfortably with it plugged" (*id*.).  A few months later, on August 24, 2006, Plaintiff underwent surgery at BCH to have the tracheotomy tube removed and exchanged for a new one (*id*.).

On October 9, 2007, Plaintiff met with Dr. Adam Wychowski, his primary care physician, complaining of an altered sense of taste and smell for the past six months (*id*. at 221-22).  Dr. Wychowski ordered an MRI to rule out structural intracranial disruption or abnormality. Plaintiff underwent an MRI of the brain with special attention to the olfactory nerves on October 20, 2007, and the results were found to be within normal limits and consistent with mild chronic sinusitis (*id*. at 227-28).

Plaintiff met with Dr. Wychowski again on March 3, 2008, for a routine physical examination (*id*. at 223-225).  Plaintiff reported that his asthma was well controlled and that he

used his albuterol inhaler rarely (*id*.).  Plaintiff denied any difficulty breathing or shortness of

breath (*id*.).  Plaintiff reported that he was working on the floor at American Eagle, a clothing

store, and that he biked regularly and went to the gym occasionally (*id*.).  Upon physical

examination, Dr. Wychowski did not identify any abnormalities (*id*.).  Dr. Wychowski assessed

Plaintiff as having asthma, which he characterized as "[m]ild intermittent," and "currently well

controlled," as well as "stenosis of the larynx" (*id*)

On January 8, 2009, Dr. Wychowski completed a questionnaire about Plaintiff's physical

residual functional capacity (*id*. at 374-78).  Dr. Wychowski reported that he saw Plaintiff

between two and five times per year, but did not quantify the number of years (*id*.).  Dr.

Wychowski identified Plaintiff's diagnoses as including subglottic stenosis and asthma and

stated that his prognosis was fair and his tracheotomy likely permanent (*id*.).  Dr. Wychowski

listed Plaintiff's symptoms as "dyspnea/shortness of breath" and "fatigue" (*id*.).  He denied that

Plaintiff suffered from pain or was a malingerer and identified tracheotomy maintenance and

asthma as the "primary issues" relating to Plaintiff's "treatment and response … that may have

implications for working" (*id*.).  Dr. Wychowski identified Plaintiff as suffering from anxiety,

but denied that any emotional factors contributed to the severity of Plaintiff's symptoms and

functional limitations (*id*.).  Dr. Wychowski offered the following opinions regarding Plaintiff's

work-related functional limitations: that, during a typical workday, Plaintiff's "experience of

pain or other symptoms" "occasionally" would be "severe enough to interfere with attention and

concentration needed to perform even simple work tasks;" that Plaintiff was capable of high

stress work; that Plaintiff could walk three city blocks without rest or severe pain; that Plaintiff

could sit for more than two hours at one time without needing to get up; that Plaintiff could stand

for at most two hours at one time before needing to sit down or walk around; that Plaintiff could

sit for at least six hours and stand for about two hours total in a work day; that Plaintiff needed a job that permitted shifting positions at will from sitting, standing, or walking; that Plaintiff needed to be able to take unscheduled work breaks once or twice each workday lasting between ten and fifteen minutes each; that Plaintiff could frequently lift and carry up to twenty pounds, but only occasionally lift and carry 50 pounds; that Plaintiff could frequently look down, turn his head left or right, and look up, but only occasionally hold his head in a static position; that Plaintiff could frequently twist, stoop (bend), crouch/squat, climb ladders, and climb stairs; and that Plaintiff had no significant limitations with reaching, handling, or fingering (*id.*). Finally, according to Dr. Wychowski, Plaintiff's impairments were likely to produce "good days" and "bad days," and Plaintiff was likely to be absent from work about two days per month as a result of his impairments or treatment (*id.*).

Plaintiff next met with Dr. Wychowski on May 4, 2009, for another routine physical examination (*id.* at 354-56). Again, Plaintiff reported that his asthma was well controlled and that he used his albuterol inhaler rarely (*id.*). Plaintiff denied difficulty breathing or shortness of breath (*id.*). Plaintiff reported that he was working at Big Y as a porter[2] and that he continued to bike regularly and go to the gym occasionally (*id.*). Upon physical examination, Dr. Wychowski did not identify any abnormalities (*id.*). Dr. Wychowski again assessed Plaintiff as having asthma, which he again characterized as "[m]ild intermittent," and "currently well controlled," as well as "stenosis of the larynx" (*id*)

Plaintiff returned to the BCH otolaryngology clinic on July 9, 2009 (*id.* at 363-69). Plaintiff was noted to be "doing well from a psychosocial standpoint," reportedly working during

---

[2] Plaintiff testified that his job as a "porter" involved janitorial-type cleaning and maintenance duties (*id.* at 444, 453).

the daytime at a retail store and doing intermittent roofing work as well (*id*.).  Plaintiff was

unable to cap his tracheotomy tube and breathe around it at any time, however, nor was he able

to utilize a speaking valve (*id*.).  It was noted that Plaintiff had a history of sporadic changing of

his tracheotomy tube, and the tube currently in place appeared "somewhat dingy and …

consistent with a trach tube that appears to have been in place for quite some time" (*id*.).  A plan

was made to schedule Plaintiff for direct laryngoscopy and bronchoscopy with a tracheotomy

tube change (*id*.).

Plaintiff next saw Dr. Wychowski on July 15, 2009 and August 6, 2009 regarding an

injury to his left hand (*id*. at 357-360).  At the July visit, Plaintiff complained of "blood blisters"

on the palm of his left hand, which he reportedly developed four weeks earlier after working on a

roof and then riding his bike home (*id*.).  Dr. Wychowski assessed Plaintiff as having a blister

and indicated that he would refer Plaintiff to a dermatology practice for probable excision and

pathology (*id*.).  By the August visit, the lesion on plaintiff's left hand had increased in size, and

Dr. Wychowski assessed Plaintiff as having a keloid (*id*.).  Because Plaintiff's dermatology

appointment was not scheduled until September and Dr. Wychowski felt that Plaintiff needed

removal and evaluation sooner, he indicated he would refer Plaintiff to a hand surgeon (*id*.).  At

the time, Plaintiff reported that he "[r]ecently started working at Big Y," and that he was able to

adapt his hand to his job without too much difficulty by keeping it covered with bandages and

gauze (*id*.).

On September 10, 2009, Plaintiff went to BCH for his direct laryngoscopy and

bronchoscopy and tracheotomy tube change (*id*. at 363-69).

On October 7, 2009, Plaintiff was seen in Dr. Wychowski's office by a physician's

assistant complaining of a runny nose and cough (*id*. at 561-64).  Plaintiff was wheezing, and he

was administered a nebulizer treatment in-office, which improved his air flow with some residual wheezing remaining (*id*.).  Plaintiff was assessed as having asthma with acute exacerbation and an upper-respiratory infection, and was prescribed prednisone for his wheezing, as well as antibiotics due to the risk of infection as a result of his tracheotomy tube (*id*.).  Plaintiff presented for a follow-up appointment on October 21, 2009, at which time his symptoms had fully resolved (*id*.).

On October 26, 2009, Plaintiff was seen at the BCH otolaryngology clinic for evaluation of his voice (*id*. at 371-72).  Plaintiff was noted to be breathing comfortably and quietly through his tracheotomy tube (*id*.).  His voice quality, however, was quite weak and breathy and "not optimal" (*id*.).  Work with a speech pathologist was recommended (*id*.).

### 3.  Assessments and Evaluations

On April 25, 2008, Dr. Erik P. Purins, a state agency physician, reviewed Plaintiff's records and completed a physical RFC assessment (*id*. at 283-91).  Dr. Purins offered the following opinions regarding Plaintiff's exertional limitations: that Plaintiff could lift and carry up to 25 pounds frequently and up to 50 pounds occasionally; that Plaintiff could sit, stand, and/or walk about six hours in an eight-hour workday; and that Plaintiff could engage in unlimited pushing and/or pulling (*id*.).  Dr. Purins identified Plaintiff's history of underlying asthma and chronic subglottic stenosis with tracheotomy as the basis for his conclusions as to exertional limitations (*id*.).  Regarding environmental limitations, Purins opined that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation (*id*.).  Purins attributed all of the environmental limitations to Plaintiff's asthma (*id*.).  Purins concluded that Plaintiff had no postural limitations, no manipulative limitations, no visual limitations, and no communicative limitations (*id*.).  Dr.

Malin Weerante, another state agency physician, completed a physical RFC assessment on September 25, 2008, and concurred with Dr. Purins' opinion with the following modifications as to environmental limitations: Plaintiff should avoid concentrated exposure to hazards, but did not need to avoid exposure to extreme heat or humidity (*id*. at 325-32).

In May 2008, Plaintiff met with Robert E. Dean, Ph. D., for an intellectual evaluation (*id*. at 292-304). Dr. Dean described Plaintiff as "cheerful, pleasant, polite, and engaging in his disposition" (*id*.). Plaintiff's speech was "fairly well articulated, although raspy because of his tracheotomy" (*id*.). Plaintiff's full scale IQ scores fell "at the upper limit of the Borderline intellectual functioning category" on the Wechsler Adult Intelligence Scale – Third Edition, and the screening measures of his basic academic skill development on the Wide Range Achievement Test – Third Revision indicated that his "scholastic achievement remain[ed] at an elementary level" (*id*.). During the interview, Plaintiff stated that he worked two days per month at American Eagle, unpacking and putting out new shipments of clothes (*id*.). He identified "many" previous jobs, including working at the post office, a book store, in food services, and as a janitor in a school (*id*.). Plaintiff was not able to explain his difficulties in maintaining stable employment other than his "trach, technically" (*id*.). The only health problems Plaintiff identified were his tracheotomy, asthma, and eczema (*id*.). Plaintiff reported that he had been a special education student and obtained a "certificate of completion" rather than a high school diploma and participated in a work-study program until he was 22 years old (*id*.). Regarding his activities, Plaintiff stated that he spent his time bicycling, downloading music and listening to it, hanging around with his friends, drawing, and taking walks (*id*.). He also reported having a driver's license and driving regularly without problems (*id*.). Dr. Dean diagnosed Plaintiff with learning disorders and borderline intellectual functioning (*id*.).

12

Following Dr. Dean's evaluation, on June 10, 2008, Dr. Jon Perelman, a state agency psychologist, completed an assessment of Plaintiff's mental RFC (*id*. at 305-323). Dr. Perelman concluded that Plaintiff was able to understand and remember simple instructions; complete simple, routine tasks; sustain concentration for at least two hours periods; and relate in a socially appropriate manner (*id*.). Dr. Peter Robbins, a second state agency psychologist who completed an assessment of Plaintiff's mental RFC, reached consistent conclusions (*id*. at 333-351).

### 4.  Plaintiff's Testimony

At the first hearing on January 22, 2010, Plaintiff testified that he had eight or nine jobs starting with his school work program and going through the present (*id*. at 443). When the ALJ inquired as to why Plaintiff did not stay in any of the jobs for long, Plaintiff responded, "[p]retty much my trach, that was interference and a learning disability, too, and how people perceived me during the jobs" (*id*. at 443-44). Plaintiff testified that he was fired from his most recent job at Big Y as a result of having too many absences (*id*. at 445). Plaintiff explained that he had missed work because he developed a cyst on his hand after helping his brother with a weekend roofing job, for which he was paid under-the-table, and he had to have it surgically removed, which required significant time out of work (*id*.). Plaintiff testified that his asthma was under control with the aid of his inhaler (*id*. at 449). He reported that he could walk approximately 4 blocks without needing to rest and stand for approximately half an hour before needing to sit (*id*. at 450). Plaintiff denied any limitations in his ability to sit, bend, crouch, or kneel and get back up (*id*.). Plaintiff testified that he is "pretty much" blind in his left eye, which interferes with his peripheral vision on that side (*id*. at 449, 451-52). His vision problem notwithstanding, Plaintiff reported driving daily, initially for work and, since becoming unemployed, to friends' houses (*id*. at 442). Plaintiff attributed his inability to find new work to the "timing … not [being] there,"

and his tracheotomy tube being a deterrent for would-be employers, despite his willingness and ability to work (*id*. at 450).

At the second hearing, Plaintiff testified that employers were "[r]eticent to hire" him because of his tracheotomy tube, but that he thought he could work if hired (*id*. at 415). Plaintiff had been collecting unemployment benefits through the first quarter of 2012 and acknowledged that he had to certify that he was ready, willing, and able to work in order to do so (*id*. at 414). By way of explanation, Plaintiff testified that he was looking for any type of work; "I was really able to work, but I just couldn't find work with my trach" (*id*.). Regarding his most recent job at Big Y, Plaintiff testified that he was out of work for three weeks as a result of having surgery on his hand due to an injury he sustained while working for his brother-in-law doing a weekend roofing job, for which he was paid under-the-table (*id*. at 415-16). Plaintiff returned to his position at Big Y after the three-week absence, but was let go three weeks later (*id*. at 417). Plaintiff felt that he was let go as a result of a "personal conflict" (*id*. at 417). Plaintiff denied having received any complaints or warnings while working at Big Y, and, other than perhaps when "it got really hectic," Plaintiff did "not really" have problems with remembering things while working (*id*. at 418). Plaintiff attributed his inability to maintain other previous employment to "my speech, my trach, and just the appearance of everything combined kind of makes people leery and maybe uneasy" (*id*. at 417). Plaintiff testified that he could read and write at a third or fourth grade level (*id*. at 418). He testified that his tracheotomy tube prevents him from working in dusty environments, but denied that it causes him any pain (*id*. at 419-20). He testified that the tube should be replaced about every six months, but his current tube was about two years old; he had not had it replaced because he had no insurance to pay for it (id.). Regarding his asthma, Plaintiff testified that it is worse in cold weather, as well as when he runs,

walks really fast, or does heavy lifting (*id*. at 420).  His is, however, able to walk a flight of stairs

without problem (id. at 420-21).  Plaintiff testified that when he gets short of breath, he utilizes

his inhaler (*id*. at 421).  Plaintiff again testified to being "pretty much" blind in his left eye,

which impacts his peripheral vision, but does not prevent him from driving (*id*. at 421).

According to Plaintiff, he also biked regularly and went to the gym about two times per week,

where he worked "[m]ostly legs and upper body" (*id*. at 422).  Plaintiff denied any limitations on

what he is able to do at the gym as a result of his impairments (*id*. at 422-23).

### 5.  Plaintiff's Father's Testimony

Plaintiff's father testified at both hearings.  He testified that Plaintiff held the job at Big Y

for about two years (*id*. at 424).  His understanding of why Plaintiff lost the job was that Plaintiff

had difficulty keeping up with a changing work schedule and following open-ended directions

(*id*. at 424-25).  Plaintiff's father described Plaintiff as a "people person," who likes being

around people and helping them and liked the people he worked with, but thought that his

appearance sometimes made them uneasy (*id*. at 425).  Plaintiff's father reported that Plaintiff

reads and writes at a third grade level, but was able to pass his driver's test (*id*. at 426-27).

Plaintiff's father also testified regarding Plaintiff's vision impairment in his left eye, and his

problems with breathing, swallowing, chronic nasal congestion, and infections (*id*. at 428-29).

He testified that he has never noticed Plaintiff stop doing anything because of his breathing (*id*.).

Plaintiff's father testified that, in his view, Plaintiff's biggest issue impeding him from getting or

holding a job are his problems with comprehension and problem solving (*id*. at 430).

6.   <u>Vocational Expert Testimony</u>

There was testimony from vocational experts at both hearings.   At the first hearing, the

ALJ posed the following hypothetical:

> Let's envisage a hypothetical individual, male, 25 years of age
> with a 12th Grade education attained under the auspices of a
> Special Education Program and past relevant work as has been
> characterized for the Claimant in this matter.   This individual has
> been documented as having borderline intellect with math and
> reading, learning disorders, history of stenosis of the larynx with a
> permanent tracheotomy placement requiring ongoing maintenance,
> asthma, [and] left eye visual impairments …. [F]or the first
> hypothetical, I'm not going to impose any exertional limits, but I
> am going to limit this individual to indoor work with no
> concentrated exposure to dust, fumes, strong odors, temperature or
> humidity extremes and it should be work that does not require use
> of the voice more than occasionally.   The work should also not
> require a need for left peripheral vision.   We're going to limit the
> work to simple, one to two-step tasks.   Now the interaction
> limitations are going to be somewhat unique in that the job itself
> should not require interaction with co-workers or supervisors more
> than occasionally.   However, there's no restrictions as to being
> around people and possibly even a preference for being around
> people. ….   And the same would be true of the public.   The job
> should not require that you interact with the public, but being in a
> place where the public is would not be a restriction. ….   Given
> these limitations, could such an individual perform any of this
> Claimant's past relevant work either as he performed it or as it is
> generally understood in the national economy?

(*Id*. at 467-69).   The VE responded that, considering Plaintiff's previous work at Big Y as a

janitor position, such a person could perform Plaintiff's past relevant work (*id*. at 469).   The ALJ

then added a restriction that the work had to be in a clean environment.   The VE testified that

past work would no longer qualify, but that other positions would, including assembler,

inspector, and packer positions in industries requiring clean environments, such as medical

16

supply, electronics, and pharmaceuticals (*id.*).  The ALJ then added a light work restriction, and

the VE testified that there would still be similar jobs available (id.).  The ALJ next added a

sedentary work restriction, and the VE responded that no packing positions would remain in any

significant numbers, but that inspector and assembly positions would (*id.* at 470-71).  Finally, the

ALJ inquired whether positions would be available if the person, "due to problems with

breathing and other maladies were likely to either have to leave the place of employment prior to

the normal quitting time or be totally absent with one or the other of these occurrences happening

at least three times a month," and the VE stated that the person would no longer be employable

(*id.* at 471).

A different VE testified at the second hearing based on the hypotheticals posed at the first

hearing.  The second VE agreed that work would be available to a hypothetical individual with

all of the restrictions imposed by the ALJ up through the sedentary work restriction (*id.* at 433).

The VE testified that this would be true even if additional restrictions were added that the

individual be limited to one to two-step tasks that would be taught by demonstration with rare

changes in routine (*id.* at 434).  If the individual were to miss work about two days per month as

a result of his disabilities, however, he would no longer be employable (*id.* at 434).

## B.  The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis

required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since his alleged onset date of October 1, 2005 (*id.* at 395 ("The

claimant worked after the alleged disability onset date, but this work activity did not rise to the

level of substantial gainful activity")).  At steps two and three, the ALJ found that Plaintiff had

certain severe impairments, consisting of "borderline intellectual functioning with mathematic,

reading and learning disorders; history of stenosis of the larynx with permanent tracheotomy

placement requiring regular maintenance; asthma and left eye vision impairment," and concluded

that the impairments, taken separately or in combination, did not meet or medically equal the

severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id.* at

396). Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform a full range of work at all exertional levels but with the
> following nonexertional limitations: he should be limited to indoor
> work with no concentrated exposure to dust, fumes, strong odors,
> and temperature or humidity extremes. He should work in an
> industry requiring a clean environment based on the product
> involved. He can perform a job that requires no more than
> occasional use of his voice. He cannot perform a job that requires
> the use of left peripheral vision. He can perform jobs that are
> limited to simple one to two-step tasks. Finally, although the
> claimant does not have to be in an isolated setting, he needs a job
> that requires no more than occasional interaction with coworkers,
> supervisors or the public for purposes of accomplishing his
> assigned tasks.

(*Id.* at 397). At step four, the ALJ determined that Plaintiff had no past relevant work (*id.* at

401). Finally, at step five, relying on the testimony of an independent vocational expert, the ALJ

determined that Plaintiff could perform jobs found in significant numbers in the national

economy taking into account Plaintiff's age, education, work experience, and RFC, and,

therefore, Plaintiff was not disabled (*id.* at 401-02).

C. Analysis

Plaintiff claims on appeal that the ALJ's conclusion as to his RFC is not supported by

substantial evidence and that the ALJ erred by not adopting the opinion of his primary care

physician when assessing his RFC. Plaintiff does not identify any specific limitation that should

have been included in the RFC, but was not. Nor does he identify which part of his primary care

physician's opinion the ALJ purportedly erred in failing to adopt. Despite Plaintiff's lack of

specificity in identifying any error, the court concludes that the ALJ did err in part.  The ALJ's

RFC assessment includes only non-exertional limitations and restrictions (*id*. at 397).  The non-

exertional restrictions are supported by substantial evidence, including the treatment records, the

consultative examinations of the state agency doctors, and the testimony from Plaintiff (*id*. at

397-401).  The substantial evidence also supports the inclusion of some degree of exertional

limitation, however.  On the other hand, the ALJ did not err in rejecting Plaintiff's treating

physician's opinion about Plaintiff's likelihood of being absent from work as a result of his

impairments or treatment.

       1.   <u>Non-Exertional Limitations</u>

     The ALJ's RFC assessment restricts Plaintiff to indoor work in an industry requiring a

clean environment and with no concentrated exposure to dust, fumes, strong odors, and

temperature or humidity extremes.  As shown by the medical records, Plaintiff has diagnosed

impairments of stenosis of the larynx with permanent tracheotomy and asthma.  Dr. Purins

opined that, based on Plaintiff's underlying asthma with chronic subglottic stenosis and

tracheotomy, Plaintiff needs to avoid concentrated exposure to extreme cold, heat, humidity,

fumes, odors, dusts, gases, and poor ventilation.  Dr. Weeratne also concluded that Plaintiff

should avoid exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation.[3]  The

ALJ gave great weight to the opinions of Drs. Purins and Weerante as to Plaintiff's non-

exertional environmental limitations as they were supported by the medical record, and he

incorporated them into his RFC (*id*. at 399).  They are also consistent with Plaintiff's testimony

that he is unable to work in dusty places and that cold weather exacerbates his asthma.  Thus, the

---

[3] Dr. Weeratne also indicated that Plaintiff should avoid concentrated exposure to hazards
(machinery, heights, etc.), but he failed to identify the hazards to be avoided or to explain the
basis for the restriction.

non-exertional environmental limitations in the ALJ's RFC assessment are supported by substantial evidence and are not in error.

The ALJ's RFC assessment also restricts Plaintiff to jobs that require no more than limited use of his voice and no use of his left peripheral vision. The BCH records from October 26, 2009, reflect that, as a result of Plaintiff's history of subglottic stenosis with tracheotomy, his voice quality is quite weak and breathy and "not optimal" (*id*. at 371-72). Both Plaintiff and his father testified that Plaintiff is basically blind in his left eye. While Drs. Purins and Weeratne did not specify any visual or communicative restrictions in their assessments of Plaintiff's records, the ALJ found that they were nevertheless supported by the medical record and testimony. The ALJ's incorporation of greater restrictions than the state agency physicians found into his RFC was not error. *See Carstens v. Comm'r of Soc. Sec.*, No. 12-1335, 2013 WL 3245224, at *6 (D.P.R. June 26, 2013) ("The fact that the ALJ gave plaintiff the benefit of the doubt in concluding that plaintiff's physical RFC was more limited than the physicians' RFC assessment should not be used to discount the ALJ's determination.").

The ALJ's RFC assessment restricts Plaintiff to work requiring no more than simple one to two-step tasks and no more than occasional interaction with coworkers, supervisors, or the public for purposes of accomplishing his assigned tasks. The only evidence about mental functional capacity comes from the consultative examination of Dr. Dean and the opinions of the state agency psychologists. Dr. Dean diagnosed Plaintiff with learning disorders and borderline intellectual functioning (*id*. at 298-99). Based on Dr. Dean's report, Dr. Perelman concluded that Plaintiff could understand and remember simple instructions; sustain concentration, persistence, and pace for two-hour periods; and relate properly to others (*id*. at 308). Those opinions are consistent with Plaintiff's own testimony regarding his abilities and do not show mental

functional limitations beyond those that the ALJ incorporated into his RFC assessment.  Thus, the mental function limitations in the ALJ's RFC assessment are supported by substantial evidence and are not in error.

### 2. Exertional Limitations

The ALJ did not incorporate any exertional limitations in his RFC.  However, the RFC questionnaire that Dr. Wychowski, Plaintiff's primary care physician, completed on January 8, 2009, specified exertional limitations relating to Plaintiff's ability to lift, indicating that Plaintiff could only occasionally lift up to 50 pounds and frequently lift up to 20 pounds.  Drs. Purins and Weerante offered similar opinions, concluding that Plaintiff could only occasionally lift and/or carry up to 50 pounds and frequently lift and/or carry up to 25 pounds.  These opinions are consistent with Plaintiff's testimony that lifting heavy things exacerbates his asthma.  The ALJ did not incorporate the doctors' opinions as to Plaintiff's lift and carry limitations into his RFC, asserting that no underlying impairment related to exertion was established (*id*. at 399).  This is simply inaccurate as the record plainly establishes that Plaintiff suffers from subglottic stenosis with asthma, and all of the opinion evidence supports a restriction on Plaintiff's ability to lift and carry as a result.  The medical opinions regarding Plaintiff's lift and carry restrictions are consistent with the definition of medium work provided in the regulations.  "Medium work" is defined as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds."  20 C.F.R. § 404.1567.

Dr. Wychowski also opined that Plaintiff can stand for at most 2 hours before needing to sit down or walk around and can stand or walk for a total of no more than 2 hours and sit for a total of at least 6 hours in an 8-hour work day.  Dr. Wychowski's opinions as to Plaintiff's limitations in sitting, standing, and walking are consistent with a sedentary work restriction.

"Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. …. [A]t the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 830-10, 1983 WL 31251, at *5 (1983). Drs. Purins and Weeratne both opined that Plaintiff can stand and/or walk for about 6 hours in an 8-hour workday. The state agency doctors' opinions are consistent with a medium work restriction. "A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." SSR 830-10, 1983 WL 31251, at *6 (1983).

Thus, the ALJ's finding that Plaintiff has no exertional limitation is not supported by substantial evidence. The evidence supports an exertional restriction of between sedentary and medium work.

### 3.  Work Absences

Dr. Wychowski opined that Plaintiff would likely be absent from work as a result of his impairments or treatment on average about two days per month. The ALJ was not required to give controlling weight to this opinion simply because Dr. Wychowski is a treating source. Pursuant to the regulations, a treating source's opinion as to the nature and severity of a claimant's impairment is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). As Plaintiff acknowledges, "the administrative law judge may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record." *Castro v. Barnhart*, 198 F. Supp. 2d 47, 54 (D. Mass. 2002). When a treating source's

opinion is not given controlling weight, the ALJ must consider such factors as the length of the

treatment relationship and frequency of examination; the nature and extent of the treatment

relationship; the supportability of the treating source's opinion; the consistency of the treating

source's opinion with the record as a whole; the specialization of the treating source; and any

other factors which support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)(i)-(ii) and

(c)(3)-(6); 20 C.F.R. § 416.927(c)(2)(i)-(ii) and (c)(3)-(6).  Here, as the ALJ explained, he

rejected Dr. Wychowski's opinion about the average number of days Plaintiff would miss work

in a month as inconsistent with the medical record and the claimant's own statements regarding

his abilities and activities (A.R. at 398).  This was not in error.

The evidence shows that Plaintiff's physical examinations were essentially normal

starting before Plaintiff's alleged onset date and going forward throughout the relevant period.

Plaintiff's physical examination at Sumner Pediatrics in January 2005 was benign (A.R. at 598-

600).  When Plaintiff was seen at BCH on December 14, 2005, he was experiencing some

wheezing, but was working as a mail handler with no difficulty (*id*. at 203-09).  Dr.

Wychowski's office notes from March 2008, May 2009, and October 2009 do not reveal any

abnormalities (*id*. at 223-25, 354-56, 561-64).  Plaintiff denied difficulty breathing or shortness

of breath at these visits, and he reported that his asthma was well-controlled and rarely required

use of his inhaler (*id*.).  Plaintiff also reported that he was working in both March 2008 and May

2009 and that he biked and worked out at the gym (*id*.).  BCH records from July 2009 report that

Plaintiff was "doing well from a psychosocial standpoint" and was working (*id*. at 363-69).  At

both hearings, Plaintiff testified that he had problems finding a job, but that he was both willing

and able to work (*id*. at 36, 415).  Indeed, he acknowledged certifying that he was ready, willing,

and able to work in order to collect unemployment benefits (*id*. at 414).  Plaintiff also testified

that he was able to drive, bike, and go to the gym regularly (*id*. at 421-22).

Furthermore, the court rejects Plaintiff's argument that the ALJ improperly discounted

Dr. Wychowski's opinion because it was solicited.  This represents a misreading of the ALJ

decision.  As the ALJ stated, "the doctor's opinion was rendered on a form provided by the

claimant's representative and amounted to a checklist with scant analysis.  When an opinion is

given in a cursory fashion, the ALJ can properly give it less weight" (*id*. at 400).  Thus, the ALJ

relied on the cursory nature of the opinion and the lack of analysis in discounting it, not the fact

that it was solicited.  Even if the ALJ considered the timing and impetus of Dr. Wychowski's

opinion, however, any error was harmless because he had other valid reasons for rejecting it.  *See*

*Reyes v. Astrue*, No. 11-30197-KPN, 2012 WL 2178963 at *6-7 (D. Mass. June 13, 2012)

(explaining that, where an ALJ discredits an opinion because it was solicited, the "decision can

still pass muster if the other reasons given to accord the opinion little weight are adequately

supported").

### 4.   The Error Regarding Plaintiff's Exertional Limitations Was Harmless

While the ALJ erred in not including any exertional limitation in his RFC assessment, he

inquired of the vocational expert whether work exists in the national economy for a hypothetical

person of Plaintiff's age, education, and work experience with all of the restrictions the ALJ

included in his RFC, who, in addition, was limited to light work or sedentary work.  The VE

testified that positions would be available for both light and sedentary restrictions.  Thus, the

ALJ's ultimate conclusion that Plaintiff was not disabled is sound even if Plaintiff is restricted to

sedentary work.  Under these circumstances, the ALJ's error in not including an exertional

limitation in Plaintiff's RFC would not change the outcome and is harmless.  *See, e.g., Brasfield*

*v. Astrue*, No. 8:11-cv-1733-T-TEM, 2012 WL 3893574, at *3 (M.D. Fla. Sept. 7, 2012) (holding claimed error by the ALJ harmless where the ALJ's hypothetical question to the VE was more restrictive than the ALJ's RFC, and the VE still identified jobs the plaintiff was capable of performing, such that the ALJ's ultimate determination was still supported by substantial evidence).

V.     Conclusion

For the reasons stated, Plaintiff's motion for judgment on the pleadings (Dkt. No. 13) IS DENIED, and the Commissioner's motion for an order affirming the decision (Dkt. No. 23) IS GRANTED.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge